Anthony P. HIGGINS and Carol Higgins, Plaintiffs,

v.

Benjamin F. WALLS, III, David W. Tyre, James H. Tyre, Jr., Martin E. Taylor, Sydney McBroom, Sean Messick, Elsie Mitchell, Melvin L. Joseph, Trustee of Trust U/A December 16, 1992, Messick Supply, L.L.C. and George W. Marvel, Sr., Defendants.

C.A. No. 03C–10–175–JRS.

Superior Court of Delaware, New Castle County.

Submitted: April 29, 2005.
Decided: Aug. 19, 2005.

Richard A. DiLiberto, Jr., Esquire and Jennifer M. Kinkus, Esquire, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Michael I. Silverman, Esquire, Silverman, McDonald & Friedman, Wilmington, Delaware, Attorney for Defendant, Elsie Mitchell (the Estate of Elsie Mitchell).

John D. Balaguer, Esquire and Donna R. Monper, Esquire, White & Williams, LLP, Wilmington, Delaware, Attorneys for Messick Supply, L.L.C.

David N. Rutt, Esquire and Martin J. Cosgrove, Jr., Esquire, Moore & Rutt, P.A., Georgetown, Delaware, Attorneys for Defendant, Melvin L. Joseph, Trustee.

## OPINION

SLIGHTS, J.

### I.

An errant bullet from a hunter's high powered rifle struck an unsuspecting motorist while traveling on a public highway adjacent to the site of the hunt. The motorist, plaintiff, Anthony Higgins ("Higgins"), sustained serious injuries from the gun shot. The hunter, Benjamin Walls ("Walls"), has limited or no resources with which to compensate Higgins for his injuries. In this suit, Higgins seeks compensation from the owners of the properties on which Walls and his companions were hunting and also from the commercial establishment that sold Walls his Delaware

state hunting license. Pending before the Court are motions for summary judgment in which each of the defendants seek a determination that they owed no duty to Higgins upon which a claim of negligence may be based. The property owner defendants also seek to avail themselves of statutory privileges (the Public Recreations on Private Lands Act and the Premises Guest Statute) that they allege protect them from claims of negligence arising from injury or conduct that occurs on their property. The supplier of the hunting license seeks sovereign immunity or protection under the Public Duty Doctrine as an agent of the State of Delaware.

For the reasons that follow, the Court finds that the statutory protections cited by the landowners do not apply here. Nevertheless, based upon settled common law principles of landowner liability, the Court concludes as a matter of law that the landowners owed no duty to Higgins under the circumstances presented here. Accordingly, their motions for summary judgment must be **GRANTED**. The supplier of the hunting license, on the other hand, is not immune from suit and did owe a duty to Higgins as a matter of law. Accordingly, its motion for summary judgment must be **DENIED**.

## II.

On the morning of January 31, 2003, Benjamin Walls, David Tyre, James Tyre, Martin Taylor, Sydney McBroom and Sean Messick (the "hunting party") began deer hunting on the property of defendant, Elsie Mitchell ("Mitchell"), in Sussex County.[1] It is undisputed that several of the individuals within the hunting party had received prior permission to hunt on the Mitchell property and had, in fact, previously hunted there and elsewhere with the caretaker and legal guardian of the property, George Marvel.[2] On the date of the incident, Mr. Marvel was in Wilmington and Ms. Mitchell was in a nursing home. Thus, neither the owner nor the caretaker of the Mitchell property was present on the property at the time of the shooting.

Shortly before the incident, Walls and Taylor left the Mitchell property and entered the adjoining property of defendant, Melvin Joseph ("Joseph"), in pursuit of deer.[3] Both Walls and Taylor admit that they did not have permission from Mr. Joseph to enter his property much less to hunt on the property.[4] While on the Joseph property, Walls fired a shot from his .30/.30 rifle at a deer towards the direction of Route 113.[5] The bullet missed the deer but struck the Higgins vehicle as it traveled southbound on Route 113.[6] The bullet entered the front windshield, fragmented and hit Higgins in his head and left hand.[7] The resulting injuries were severe.

Joseph was not present on his property at the time the shot was fired. He was,

---

1. D.I. 89, ¶ 19.

2. *Id.* at ¶ 26. In 2003, George Marvel became the court-appointed guardian of Elsie Mitchell. The Guardianship Order permitted Mr. Marvel to occupy the home and outbuildings on the Mitchell property, without paying rent, for the purpose of maintaining the home and outbuildings. The Order also allowed Mr. Marvel to hunt on the property as long as such activities did not interfere with the operations of the tenant farmer. *See id.* at ¶¶ 21–22.

3. At oral argument, counsel indicated that Mr. Joseph passed away two weeks before the argument. His estate will be substituted as a party defendant.

4. D.I. 91, App. at 155; D.I. 110, at Ex. J.

5. D.I. 89, at ¶ 28.

6. *Id.* at ¶ 17.

7. *Id.* at ¶ 18.

however, regularly on the property in order to observe as a portion of the 156–acre property was being cleared for possible future development.[8]

At some time prior to the incident, Walls had obtained a State of Delaware hunting license from defendant, Messick Supply, LLC ("Messick"), a plumbing supply and convenience store authorized by the State of Delaware to sell state hunting licenses.[9] To qualify for a hunting license, the applicant must demonstrate to the licensor that he has completed a ten hour hunter safety course.[10] The licensor can verify completion of the course by inspecting the applicant's "Hunter Safety Card" or a valid license from the previous year containing a hunter's safety number.[11] Walls has never completed a hunter safety course and it does not appear that he possessed a hunting license from the previous year.[12] In addition to the fact that Walls had not completed the requisite training, the parties appear to agree that Walls was ineligible for licensure because he was a convicted felon. The parties also appear to agree that the weapon Walls was using was not legal for this hunt pursuant to Delaware hunting regulations and that firing in the direction of a public roadway is contrary to settled safe hunting practices.[13]

Mr. Higgins filed suit against Mitchell, Joseph, and Messick alleging that their negligence proximately caused his injury.[14] Mitchell, Joseph and Messick now move for summary judgment alleging that they are statutorily protected from liability and that they did not owe a duty to Higgins.[15]

### III.

Joseph claims that he is protected from liability by the Public Recreation on Private Lands Act (the "Public Recreation Act"). According to Joseph, the Public Recreation Act protects landowners from liability to persons injured on the landowner's property when the landowner has opened up his property to the public for recreational use. He argues that the Public Recreation Act's protections apply even if the injured party was not on the landowner's property at the time of the injury. Alternatively, Joseph contends that even if the Public Recreation Act does not help him, he is still entitled to dispositive relief because he owed no duty to Higgins. In this regard, he argues that the owner of real property has no duty to protect the public from the criminal acts of those who have no permission to be on the property except in rare circumstances not present here. In this case, Joseph alleges that Higgins is estopped from arguing that

8. D.I. 110, at Ex. H.

9. D.I. 89, at ¶ 31.

10. DEL.CODE ANN. tit. 7, § 501(a) (2001).

11. D.I. 98, at 3.

12. D.I. 89, at ¶ 33.

13. *Id.* at ¶¶ 26–29.

14. Joseph was named in his capacity as trustee of a trust that owned the property. D.I. 89, at ¶ 9. Higgins also brought suit against Benjamin Walls, David Tyre, James Tyre, Martin Taylor, Sydney McBroom, Sean Messick and George Marvel alleging that their negligence also was a proximate cause of his injuries. These claims are not a subject of the motions *sub judice.*

15. Mitchell, Joseph and Messick also sought summary judgment on the issue of proximate cause. The Court denied the motions at the conclusion of oral argument upon concluding that the issue of causation as to each defendant raised disputed issues of fact. *See Midcap v. Sears, Roebuck & Co.,* 2003 WL 22290060, at *1 (Del.Super.)("[Q]uestions of proximate cause are, except in rare cases, questions of fact which ordinarily should be submitted to the jury to be resolved.").

Walls had permission to be on the Joseph property because a fact-finder already has determined that Walls was trespassing in connection with a companion criminal prosecution.

Higgins takes issue with Joseph's characterization of his responsibilities as landowner. According to Higgins, Joseph owed a duty as a landowner to the public at large, and to him specifically, to take reasonable steps to prevent all reasonably foreseeable negligent acts of others on his property, including criminal acts if they were foreseeable. Further, he contends that imposing liability on Joseph under the circumstances presented here would not be contrary to public policy as reflected in the Public Recreation Act because responsible landowners would not be deterred from opening their land for recreational use. And, moreover, notwithstanding Joseph's public policy protest, the Public Recreation Act cannot protect him here because Higgins was not on Joseph's land when he was injured.

Mitchell also seeks protection from the Public Recreation Act. In addition, because it appears clear that the members of the hunting party were guests on the Mitchell property, Mitchell also seeks to invoke Delaware's Premises Guest Statute. And, finally, to the extent it is determined that she enjoys no statutory protection from liability, Mitchell argues that she owed no duty to Higgins as a matter of law.

Higgins again counters that neither the Public Recreation Act nor the Guest Premises Statute apply because Higgins was not on Mitchell's land when the injury occurred. Further, Higgins claims that Mitchell owed a duty as a landowner to

protect the public from the foreseeable negligent actions of Walls while he was on her property.

For its part, Messick also looks to Delaware's statutory law for protection from Higgins' claims. Specifically, Messick argues that it was a duly appointed licensing agent of the State of Delaware and is, therefore, constitutionally and statutorily immune from suit. Messick also argues that it owed no specific duty either to Higgins or to Walls because, as an agent of the State, its duty ran to the public at large and not to any one individual. According to Messick, then, the so-called Public Duty Doctrine is implicated here and acts to bar Higgins' claims.

Higgins argues that each of Messick's arguments fails for the simple reason that Messick is not a government actor such that it may avail itself of sovereign immunity, the Tort Claims Act, or the Public Duty Doctrine. According to Higgins, Messick owed a duty to him to ensure that Walls was not licensed to hunt in Delaware without proper training and without otherwise satisfying the Delaware requisites for licensure. Whether this duty was breached must be determined by a jury.

### IV.

Joseph's and Mitchell's motions, although styled as motions to dismiss, must be considered (along with Messick's Motion for Summary Judgment) under Rule 56 because they both have relied upon matters outside the pleadings.[16] On a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party.[17] It is

16. *See* DEL. SUPER. CT. CIV. R. 12(b) (2005)("[I]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleadings to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court the motion shall be treated as one for summary judgment. . . .").

17. *Brzoska v. Olson,* 668 A.2d 1355, 1364 (Del.1995) (citations omitted).

from this perspective that the Court must examine all pleadings, affidavits and discovery filed in support of and in response to the motion.[18] Summary judgment may only be granted if the court determines that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[19] The initial burden rests with the movant to demonstrate the absence of a material issue of fact and a settled legal basis for relief.[20] If the movant meets this burden, the burden then shifts to the non-moving party to show that material factual issues remain in dispute.[21]

## V.

In the typical case, on a motion for summary judgment, the Court would address the threshold legal issue of duty before reaching any affirmative defenses that the defendant may proffer as a basis for dispositive relief. In this case, however, each of the defendants have led off in their motions with novel interpretations of various provisions of Delaware's statutory law that they allege protect them from liability here. The arguments are substantive and deserve treatment. Accordingly, the Court will address the statutory defenses first before considering the issue of duty.

### A. The Defendants' Attempted Invocation of Statutory Privileges and Immunities

#### 1. The Joseph Motion

In his initial moving papers, Joseph accepted as true Higgins' allegations that the hunting party had permission to hunt on his property. Accordingly, Joseph focused his argument for dispositive relief on the protection afforded by the Public Recreation Act.[22] Apparently sensing some compromise in his position resulting from this concession, Joseph argued in his reply papers that Higgins should be barred from litigating the issue of permission under the doctrine of collateral estoppel in the wake of Walls' criminal conviction for Trespass to Hunt in connection with the incident. This apparent reconsideration of strategy, while perhaps conducive to his duty argument, effectively blocks Joseph's path to the Public Recreation Act.[23] Despite this patent inconsistency, the Court will address Joseph's argument with the assumption that the hunting party and the public at large had permission to hunt on the Joseph property.[24]

---

18. *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.*, 312 A.2d 322, 325 (Del.Super.Ct.1973).

19. *Dale v. Town of Elsmere*, 702 A.2d 1219, 1221 (Del.1997).

20. *Brzoska*, 668 A.2d at 1364.

21. *Id.*

22. In order to be eligible for protection under the Public Recreation Act, the landowner must give permission to use the land for recreational purposes. *See* DEL. CODE ANN. tit. 7, § 5901 (2001)("The purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes, whether such persons entered upon the land of the owner with or without consent of the owner.").

23. *Gibson v. Keith*, 492 A.2d 241, 246 (Del.1985)("Therefore, an owner who does not evidence an intent to permit the public to enter for recreational use may not invoke the statute's protective benefits against liability.").

24. As discussed below, the undisputed record reveals that Joseph did not give permission to the public at large, and to the hunting party in particular, to use his property for recreational purposes. This fact alone renders the Public Recreation Act inapplicable. Because Joseph has addressed other aspects of the statute in his motion, the Court will address them here in order to complete the analysis.

■ The purpose of the Public Recreation Act is to encourage landowners to open their lands to the public for recreational uses, including hunting.[25] To facilitate this purpose, the Public Recreation Act shields the private landowner from liability for claims sounding in ordinary negligence arising from injury to person or property while members of the public use the property for recreation.[26] Because the statute is in derogation of common law, it must be construed strictly against the party seeking its protection.[27] The Public Recreation Act may only be invoked by landowners who open their land to the public for recreational purposes.[28] And, for the reasons discussed below, it may only be invoked to protect against claims made by those injured on the property.

Joseph argues that the Public Recreation Act protects an otherwise qualified landowner against claims arising from an off-premises injury if the conduct causing the injury occurred on the landowner's property. He cites authority from both state and federal courts in Hawaii as support for this interpretation of the statute.[29] In *Atahan*, the injured party entered by

foot on to the defendant's land and proceeded through the property to the adjoining public beach. The plaintiff was subsequently injured by a dangerous condition on the public beach. The court held that Hawaii's version of the Public Recreation Act shielded the defendant landowner from liability. In doing so, the court acknowledged that its finding was intended to avoid an otherwise untenable result. Specifically, the court noted that, by law, the beaches and waters were owned and controlled by the state, a sovereign government immune from suit. The court concluded that it would be patently unfair on the one hand to allow liability to flow to a private landowner of adjacent property who was in no position to control the state's land, but on the other hand to extend statutory protection to the sovereign landowner that was in control of the property.[30]

■ Here, while it is true that Higgins was injured by negligent acts occurring on the Joseph property, the parties agree that Higgins never entered onto the Joseph property—he never surrendered his cause of action against Joseph.[31] The Public Re-

---

**25.** *See* DEL. CODE ANN. tit. 7, § 5902(3) (2001)("hunting" included within the statutory definition of "recreational purpose.").

**26.** *Gibson*, 492 A.2d at 244("[The Court] base[s] this result upon what we find to be the statute's underlying purpose: to encourage landowners to permit their lands to be made available for public use for recreational purposes. In return, the statute grants such owners broad immunity against suit by a gratuitous public invitee injured while pursuing recreational activities.").

**27.** *State v. Brown*, 195 A.2d 379, 383 (Del. 1963)("It is true that statutes in derogation of common law must be strictly construed.").

**28.** *Gibson*, 492 A.2d at 246.

**29.** *See Atahan v. Muramoto*, 91 Hawai'i 345, 984 P.2d 104 (Ct.App.1999), *Viess v. Sea En-*

*terprises, Corp.*, 634 F.Supp. 226 (D.Haw. 1986).

**30.** *Atahan*, 984 P.2d at 112, *citing Viess*, 634 F.Supp. at 229("[I]t would be preposterous to hold a landowner liable for injuries to anyone using the beach and ocean in front of his land—an area solely owned and controlled by the state and county—when under Chapter 520 (Hawaii's version of the Public Recreation Act), if he had owned and controlled that beach and water he would have no liability at all.").

**31.** In analyzing the Public Recreation Act, it is helpful to look at the competing interests of both the landowner and the recreational user that are in play when private property is offered for public recreational use. The landowner offers up his land for public enjoyment, surrendering exclusive use of the property. In return, he enjoys a statutory

creation Act specifically states that it will provide the landowner protection from claims of negligence brought by those "entering thereon" who incur an injury.[32] This language is clear and unambiguous and must be afforded its plain meaning.[33] Additionally, while Delaware and Hawaii share a similar version of the model Public Recreation Act,[34] the Court has found no other jurisdiction that has applied the Act to protect a landowner from a claim of negligence when the plaintiff was not injured on the landowner's property. Moreover, as best as the Court has been able to determine, no jurisdiction, including Hawaii, has ever applied the Public Recreation Act to shield liability for an off-premises injury where the injured party *never* entered onto the defendant's land.[35]

■ Furthermore, the Court is persuaded by Higgins' argument regarding the public policy ramifications of Joseph's proffered reading of the statute. The clear intent of the legislature is to protect landowners from injuries that occur on private property opened for public use.[36] Clearly, hunting is one of the recreational activities enumerated in the Public Recreation Act, and the General Assembly no doubt appreciated that hunting involves the use of high-velocity projectiles that were capable of traveling beyond property boundaries. Nevertheless, nothing in either the legislative history or text of the Public Recreation Act suggests that the General Assembly intended to foreclose a claim against the landowner from an innocent passerby who has not sought to par-

privilege from liability in the sense that his duty of care to recreational users is extinguished. *See* DEL. CODE ANN. tit. 7, § 5903 (2001) ("[A]n owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes...."). *See also* RESTATEMENT (SECOND) OF AGENCY § 217 cmt. a & b (2005)("Privilege denotes the fact that conduct which under ordinary circumstances subjects the actor to liability, under particular circumstances, does not subject him thereto;" whereas "immunity denotes the absence of civil liability for what would be tortious but for the relation between the parties or the status or position of the actor."). On the other hand, the recreational user enjoys the opportunity to use the land, but gives up his cause of action against the landowner for non-willful or wanton negligence. When the plaintiff never enjoys the benefits of the recreational use of the property, it is difficult to conceive of any basis upon which it can be said that he has forfeited his claim against the negligent landowner.

32. DEL. CODE ANN. tit. 7, § 5901 (2001)("The purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons *entering thereon* for such purposes.") (emphasis added).

33. *Ryan v. State*, 791 A.2d 742, 743 (Del. 2002)("It is settled law that, if a statute is unambiguous, no interpretation is necessary and the plain meaning of the language in the statute controls.") (citations omitted).

34. The model Public Recreation Act has evolved into four separate versions that have been adopted by forty-six states. *Gibson*, 492 A.2d at 248. Delaware shares essentially the same version of the statute with fifteen other states, including Hawaii. *Id.* The other states include: Arkansas, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Maryland, Minnesota, Nebraska, Oregon, Pennsylvania, South Carolina and Utah. *Id.* In searching the case law of the jurisdictions that share Delaware's version of the statute, the Court has found no other authorities that extend the statute's protection to a defendant where the plaintiff was not injured on the defendant's land.

35. *See* W. PAGE KEETON ET AL.; PROSSER & KEETON ON TORTS § 60 at 416 (5th ed. 1984)("Although the statutes vary in their particulars from state to state, they *all* limit the duties of the landowners toward recreational users *injured on the land* .... ")(emphasis added).

36. *See generally* DEL. CODE ANN. tit. 7, §§ 5901–5907 (2001).

take in the landowner's offering of his property for recreational use. Nor is there any suggestion that the General Assembly sought to shield landowners from responsibility when activities occurring on their property pose an unreasonable risk of injury to others beyond the property's borders.

### 2. The Mitchell Motion

■ Mitchell also argues that Higgins' claims are barred under the Public Recreation Act.[37] The Court already has determined that this argument fails because it finds no support in the text of the statute and is inconsistent with the statute's stated purpose.

■ Mitchell's effort to invoke the Premises Guest Statute suffers from the same infirmity. Like the Public Recreation Act, the text of the Premises Guest Statute limits its application to those instances where the would-be plaintiff "enters onto" the defendant's property.[38] Again, it is undisputed that the injured party (Higgins) never entered onto the Mitchell property and, consequently, Mitchell may not claim protection under the Premises Guest Statute.[39]

### 3. The Messick Motion

Although Messick concedes that it issued Walls a hunting license when Walls was not qualified to receive the license, Messick argues that Higgins' claims are barred by sovereign immunity and the Tort Claims Act. The Court will address these claims of immunity *seriatum.*

#### a. Sovereign Immunity

■ Messick contends that the doctrine of sovereign immunity extends to its licensing functions because it is a duly appointed licensing agent of the state of Delaware. "In general, the doctrine of sovereign immunity provides that the State may not be sued without its consent."[40] This immunity also bars suit against employees of the State in their official capacities.[41] The State's sovereign immunity may only be waived by an Act of the General Assembly.[42]

The success of Messick's effort to invoke sovereign immunity turns on the question of *vel non* it was operating as a government entity acting in its official capacity when it issued hunting licenses to its customers.[43] The legislative history of the statute that authorizes Messick to sell hunting licenses provides the answer to

37. *Id.*

38. DEL. CODE ANN. tit. 25, § 1501 (2001)("No person who *enters onto* private residential or farm premises . . . .")(emphasis added).

39. The Premises Guest Statute being in derogation of common law must be construed against the party seeking its protection. *See Ritchie v. Schilling,* 1999 WL 1611378, at *1(Del.Super.); *Stratford Apartments, Inc. v. Fleming,* 305 A.2d 624, 626 (Del.1973).

40. *Doe v. Cates,* 499 A.2d 1175, 1176 (Del. 1985).

41. *See McCloskey v. Clothier,* 1987 WL 14818, at *3 (Del.)("[T]he State and the remaining

named defendants in their official capacities are immune from suit under the doctrine of sovereign immunity.").

42. *Doe,* 499 A.2d at 1176.

43. Messick conceded at oral argument that it could find no case law supporting the proposition that private licensing vendors are to be considered government entities for purposes of sovereign immunity. Nevertheless, Messick argues that, when issuing hunting licenses, it acts in an official governmental capacity as an extension of the State of Delaware Department of Natural Resources and Environmental Control ("DNREC").

this dispositive question.[44] Prior to the 2004 amendment to the statute, the State's hunting licensing vendors, such as Messick, enjoyed no immunity from suit.[45] Realizing this shortcoming, the General Assembly in 2004 extended immunity to these licensing vendors and, in doing so, clearly expressed its intent that such immunity was not to be applied retroactively.[46] Indeed, the parties appeared to agree at oral argument that the "case" to which Senator Venables was referring in his remarks is the case *sub judice*.

When interpreting a statute, courts must examine the statute as a whole,[47] and to the extent possible strive to give each provision of the statute meaning and effect.[48] In order to accept Messick's immunity argument, however, the Court would have to ignore this fundamental tenet of statutory construction. Specifically, if the

Court determines that sovereign immunity existed for Messick and other licensing vendors prior to the passage of the amendment to Section 511(f), as Messick urges the Court to do, the Court would have to conclude that the amendment was superfluous. This conclusion, not supported by any reasonable interpretation of the statute or its history, will not be endorsed here.

### b. The Torts Claims Act

 Messick next argues that its employees are employees of the State that are subject to the protection of the State Tort Claims Act.[49] The Tort Claims Act codified existing common law principles of sovereign immunity and set forth legislatively authorized exceptions to the doc-

---

44. *See* DEL. CODE ANN. tit. 7, § 511(a) (2001)("The Department may authorize as many qualified persons as Licensing Agents as it deems necessary to effectuate the efficient distribution of the licenses, permits and stamps...."). *Cf.* DEL. CODE ANN. tit. 7, § 511(f) (2004 supp.)("Except as provided by the Constitutions or laws of the United States or of the State, as the same may expressly require or be interpreted as requiring by a court of competent jurisdiction, no claim or cause of action shall arise, and no judgment, damages, penalties, costs or other money entitlement shall be awarded or assessed against any person authorized by the Department as a Licensing Agent in any civil suit or proceeding at law or equity....").

45. *See* S.B. 211, 142nd Gen. Assem. (June 9, 2004)(remarks of Senator Venables, the sponsor of the Bill)("What Senate Bill 211 does is basically give immunity from lawsuits for agents of the State of Delaware who sell hunting and fishing licenses. And what brought this about was a case in Sussex County which certainly is going to affect all of the State of Delaware. We had one of the stores, country stores, sell a hunting license, using the record he had previously been licensed a year before, and the man went out and had some serious violations, broke the law in several cases. A

lawsuit resulted from that and under joint and several liability I guess they go down the line and sue everyone. And basically if this happens and this lawsuit is successful *it certainly is not going to affect the person being sued now* but in the future what it would do would send a message out to the rest of the people that sell licenses that you would be immune from lawsuit.")(emphasis added).

46. *Id.*

47. 2A NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION, § 46.06, at 181 (6th ed. 2000)("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.").

48. *Id.* at 181–86 ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous...."). *See also Keeler v. Harford Mutual Ins. Co.*, 672 A.2d 1012, 1016 (Del. 1996)("In determining legislative intent in this case, we find it important to give effect to the whole statute, and leave no part superfluous.").

49. *See* DEL. CODE ANN. tit. 10, § 4001 (2004).

trine.[50] "The act [is] intended to discourage law suits which might create a chilling effect on the ability of public officials or employees to exercise their discretionary authority."[51] As this court has held:

> [The Tort Claims Act] provides that State officers or actors are protected by a statutory limitation on civil liability if (1) the alleged tortious conduct arose out of and in connection with the performance of an official duty, (2) was performed in good faith, and (3) without gross or wanton negligence. The plaintiff has the burden of proving the absence of one or more of the criteria or elements of immunity.[52]

It is well-settled that an independent contractor is not, as a matter of law, a State actor.[53] The Court must determine, therefore, whether Messick's employees were employees/agents of the State or independent contractors. Whether a party is an employee or an independent contractor is a question of law.[54] In making this determination, the Court must consider all of the facts and circumstances surrounding the particular relationship, giving particular emphasis to the ability of one party to control the other's performance.[55] Where the facts indicate that one party controlled the details of the other party's performance, the Court must find an employee-employer relationship.[56]

Here, it is clear that the State did not control the details of Messick's employees' performance. Messick, not the State, set the store's hours. Messick was responsible for hiring and firing the employees. Messick determined the manner and location within the store where the licenses would be sold. And Messick was responsible for all accounting and administrative record keeping. The State played no part in the administration of any of these details. The employees relied solely upon Messick for direction.[57]

Moreover, Messick agreed that its relationship with Delaware would not be deemed a waiver of the *State's* immunities,

---

**50.** *Doe,* 499 A.2d at 1180.

**51.** *Id.* at 1180–81.

**52.** *Scott v. Walsh,* 1996 WL 944978, at *3 (Del.Super.)(internal quotations omitted).

**53.** *See Syvy v. Landmark Eng'g, Inc.,* 2005 WL 791391, at *1 (Del.Super.)("There is no reference to immunity for individual entities performing traditional government functions through independent contractual relationships and there is absolutely nothing to suggest the General Assembly ever intended to extend this immunity beyond the limited classification of State employees or those serving on government boards. This is not only logical but practical since to interpret otherwise would open the door to allow every independent entity, who performs some work for a government agency, to claim that it is somehow encompassed within the statute and the immunities that flow from it.").

**54.** *See Porter v. Pathfinder Servs., Inc.,* 683 A.2d 40, 42 (Del.1996)("The existence of an employer-employee relationship is an issue of law."); *Barnard v. State,* 642 A.2d 808, 813 (Del.Super.Ct.1992)("The question of the existence of an employer/employee relationship is an issue of law that depends on the facts and circumstances of the particular case, with no single element being decisive.").

**55.** *See* 41 AM.JUR. 2D *Independent Contractors* § 12 (2005)("The right to control the details of performance is the crucial factor in determining the status of an individual who performs services for another."). *See also Porter,* 683 A.2d at 42 ("The greatest weight is given to the issue of control."); *Hudson v. Tyson Foods,* 2004 WL 1790141, at * 3 (Del.Super.)("The right to control is the most predominant and important fact in the determination of whether or not an employee-employer relationship exists.").

**56.** *Id.*

**57.** D.I. 91, App. at 114–18, 129, 133–35.

while at the same time Messick claimed no immunities for itself and the State offered none.[58] Additionally, none of Messick's employees are governed by the statutory obligations and benefits that are applicable to employees of the State of Delaware, including: swearing an oath to the United States and Delaware Constitutions; having Saturdays as a legal holiday; and leave for Olympic participation.[59] State employees also are subject to the Freedom of Information Act.[60] Messick, no doubt, would object to making its business records available for public inspection.

Finally, the Court cannot help but to return to the fact that the General Assembly itself appeared to realize that its hunting license vendors were vulnerable to suit when it enacted the 2004 amendment to the licensing statute. This amendment would not have been needed if such protection was previously available to licensing vendors under the Tort Claims Act. In the absence of a constitutional or specific statutory grant of immunity afforded to hunting license vendors, such vendors must answer for their negligent acts.

### B. Did the Defendants Owe a Duty to Higgins?

Having determined that none of the moving defendants are entitled to avail themselves of a statutory privilege or a statutory or constitutional immunity, the Court now considers whether each of the moving defendants owed a duty to Higgins

such that a claim of negligence may properly lie against them. Before addressing each defendant individually, the Court will briefly explore the concept of duty in the negligence context both generally and specifically in regards to landowner liability.

### 1. The Duty of Care and Landowner Liability

 "Whether a duty exists is entirely a question of law to be determined ... by the court." [61] "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person...." [62] The court's role, therefore, when determining whether a duty exists is first to study the relationship between the parties and then to determine, based upon statutory and/or common law principles, whether the relationship is of a nature or character that the law will impose a duty upon one party to act for the benefit of another.

 Owners of property have a near absolute right to conduct their affairs on their own property in the manner of their choosing and without interference from others.[63] In doing so, however, the property owner must take into account how his actions might affect others and refrain from acting in a manner that poses an unreasonable risk of harm to foreseeable third parties.[64] The law imposes this

---

**58.** D.I. 91, App. at 85.

**59.** Del.Code Ann. tit. 29, §§ 5101, 5104, 5113 (2001).

**60.** Del Code Ann. tit. 29, § 10003 (2001).

**61.** *Kuczynski v. McLaughlin*, 835 A.2d 150, 153 (Del.Super.Ct.2003) *citing Shively v. Ken Crest Centers for Exceptional Persons*, 2001 WL 209910, at *5 (Del.Super.).

**62.** 57A AM. JUR. 2D *Negligence* § 81 (1989). *See also Atlantic & Pacific Railroad Co. v. Laird*, 164 U.S. 393, 399, 17 S.Ct. 120, 41 L.Ed. 485 (1896)(finding that tort notions of duty arise from the relationship between plaintiff and defendant).

**63.** *See* 62 AM. JUR. 2D *Premises Liability* § 1 (2005).

**64.** *Id.* ("While the property owner is entitled to uninterrupted use and enjoyment of the

duty because the owner of property typically is in the best position to control how the property is used.[65] Yet the law also recognizes that a landowner's duty to third parties cannot be stated in absolute terms; its existence will depend upon several factors, including the relationship between the landowner and the injured party and/or the relationship between the landowner and parties who are present on the property and whose conduct causes injuries to others.[66] It is within this analytical framework that the Court must consider whether the moving defendants in this case owed a duty to Higgins.

### a. Joseph Owed No Duty To Higgins

Higgins argues that Joseph owed him a duty to take reasonable steps to ensure that those hunting on his property were doing so in a safe manner. Such steps would include ensuring that hunters were not in such close proximity to public roadways that a stray bullet could strike passing motorists. Such steps also would include making sure that the hunters were properly trained and that they were engaged in safe hunting practices while on the property.[67]

In response, Joseph urges the Court not to lose sight of the fact that the hunting party was on his property without permission at the time of the incident. In this regard, Joseph requests that when the Court engages in the first step of the duty analysis—determining the relationship between the parties—the Court pay due regard to a record that clearly reflects that the relationship between Joseph and Walls was that of landowner and trespasser. As to this issue, Joseph argues that the doctrine of collateral estoppel bars the parties from re-litigating the issue of Walls' permission to be on or hunt on the Joseph property. The Court agrees.

 Collateral estoppel bars a party from re-litigating a factual issue previously litigated and resolved by a fact-finder.[68] "In order for collateral estoppel to apply, the following criteria must be present: (1) the issue previously decided is identical to the issue at bar; (2) the prior issue was finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in a prior action." [69] Here, the issue of Walls' permission to be on the Joseph property was litigated fully when Walls was prosecuted for Trespass to Hunt in the Superior Court. Of course, in

---

property he or she must have due regard for the public good, and a reasonable and humane regard for the welfare and rights of others.").

65. *See* KEETON, *supra* note 35, § 57, at 386 ("[T]he person in possession of property ordinarily is in the best position to discover and control its dangers, and often is responsible for creating them in the first place. He has a privilege to make use of the land for his own benefit, and according to his own desires, which is an integral part of our whole system of private property; but it has been said many times that this privilege is qualified by a due regard for the interests of others who may be affected by it.").

66. 57A AM. JUR. 2D *Negligence* § 81 (1989)("Unless and until some relationship exists between the person injured and the defendant, by which the latter owes a duty to the former, there can be no liability for negligence. A duty ... may arise from a special relationship that requires the defendant to protect against a risk of harm to the plaintiff.").

67. D.I. 89, at ¶¶ 71–75.

68. *Ingram v. 1101 Stone Assocs. LLC*, 2004 WL 691770, at *8 (Del.Super.).

69. *Id.*

that case, the issue was considered against a much higher burden of proof—proof beyond a reasonable doubt.[70] Walls' permission to be on the property was an element of the offense for which he was charged and the fact-finder's guilty verdict reflects a finding beyond a reasonable doubt that no such permission was given.[71]

In this case, the collateral estoppel analysis is complicated somewhat by the fact that Joseph seeks to use Walls' criminal conviction against Higgins who was not a party to the criminal proceeding. In order properly to apply collateral estoppel under these circumstances, the Court must first conclude that Higgins is "in privity" with a party to the criminal case. "Privity is a legal determination for the trial court with regard to whether the relationship between the parties is sufficiently close to support preclusion." [72] "The term privity signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive on the others, although those others were not party to the lawsuit." [73] Courts have held that a nonparty will be bound when its interests were represented adequately by a party in the original suit.[74]

Here, the Court is satisfied that Higgins is in privity with Walls with respect to the defense of the Trespass to Hunt charge in the criminal proceeding. To prevail in his defense, Higgins had every incentive to expose weakness in the State's proof on the issue of trespass and to argue every reasonable doubt with respect to this issue. Walls was not able to raise a reasonable doubt, however, and ultimately was found guilty of Trespass to Hunt. The fact-finder's determination that Walls lacked permission to hunt on the Joseph property was more conclusive (beyond a reasonable doubt) than the probability standard at work in this case. There is, therefore, no legal basis to litigate the issue anew.

Having concluded that Joseph did not give permission to the hunting party to be on his property at the time of the incident, the Court must now consider the extent of Joseph's duty to Higgins, if any, under the following circumstances: (i) Joseph was a landowner; (ii) Walls and the other members of the hunting party were trespassers on Joseph's property; and (iii) Higgins was a third party who, while not present on Joseph's property, was injured by conduct occurring on Joseph's property.

Joseph claims that a landowner's duty under these circumstances extends only to business invitees or individuals with some other special relationship to the landowner

---

**70.** *See Cunningham v. Outten,* 2001 WL 428687, at *1 (Del.Super.)("This Court has previously noted that under modern law the decision of whether a criminal conviction can be conclusive as to a question of fact in a civil case rests in the sound discretion of the court....."). *See also Brooks Armored Car Service, Inc. v. Payne,* 1992 WL 54260 (Del.Super.)(finding that defendant's criminal conviction for theft was binding on the court in the subsequent civil suit); *Nationwide Mut. Ins. Co. v. Flagg,* 789 A.2d 586, 594 (Del.Super.Ct.2001)("To preclude a civil litigant from relitigating an issue previously found against him in a criminal prosecution is less severe than to preclude him from relitigating such

issues in successive civil trials, for there are rigorous safeguards against unjust conviction, including requirements of unanimous verdict, the right to counsel, and a record paid for by the state on appeal.").

**71.** *See* D.I. 110, at Ex. G.

**72.** 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 132.04[1][b] (3d ed.2004).

**73.** *Id.*

**74.** *Id.*

or permitted occupant of the property (e.g. a tenant).[75] He also contends that the duty will not extend beyond the property's borders.

While a landowner will not be liable for an injury simply because a negligent act occurred on his property,[76] the landowner's duty is broader than Joseph has suggested. A property owner can, under certain circumstances, face liability for the acts of those on his property without permission and for injuries sustained off the property.[77] And while it is generally true that a landowner does not owe a duty to those injured by others on the property over whom the landowner has no control,[78] a duty may arise where the landowner knew or should have known of the risk created on his property and did nothing to prevent it.[79] This duty has been extended even when the source of the known risk is a trespasser:

> There have been surprisingly few cases dealing with liability for the conduct of trespassers and others acting without

the possessor's knowledge or consent. It seems clear, however, that he is not liable for such conduct, or for the conditions resulting from it, until he knows or should know of the danger, but that once he has had a reasonable opportunity to discover the situation he is under a duty to exercise proper care to prevent harm to others.[80]

Based on these settled principles of common law landowner liability, the determination of whether Joseph owed a duty to Higgins will turn on whether he knew or should have known that hunting activities occurring on his property constituted a dangerous condition. In support of his motion, Joseph has placed in the record his sworn testimony that he had no actual or constructive knowledge of unauthorized hunting activities occurring on his property and that he did not learn of them until some time after the incident.[81] Joseph's properly supported denial of actual or constructive knowledge satisfies his

---

**75.** 62 AM. JUR. 2D *Premises Liability* § 45, 46 (2005)("The rule that a private person has no duty to protect another from a criminal attack by a third person in the absence of statute or some special relationship or circumstance is subject to certain exceptions, such as where such a duty of protection is assumed by the express agreement ... or business operator and patron....A possessor of realty may owe his or her customers and other invitees a duty to keep them free from criminal attacks by third parties on the premises. Such protection may be part of the duty to exercise ordinary care to maintain the premises in a reasonably safe condition. Protection from such an attack is only required if it is foreseeable, or should have been anticipated....").

**76.** 62 AM. JUR. 2D *Premises Liability* § 41 (2005)("The fact that a negligent act that causes an injury is done on a person's land or property does not render that person liable if he or she has no control over the persons committing such act....").

**77.** RESTATEMENT (SECOND) OF TORTS § 371 (1965)("A possessor of land is subject

to liability for physical harm to others outside of the land caused by an activity carried on by him thereon which he realizes or should realize will involve an unreasonable risk of physical harm to them under the same conditions as though the activity were carried on at a neutral place.").

**78.** *See* 62 AM. JUR. 2D *Premises Liability* § 41 (2005).

**79.** *Id.* at § 42 ("The general rule that an owner or occupant of premises has no duty to control the conduct of third persons on his or her premises does not apply ... where the negligent conduct of the third person created a dangerous condition that the possessor of real property should have discovered and corrected but that he or she failed to take reasonable precautions to alleviate.").

**80.** KEETON, *supra* note 35, § 57, at 392.

**81.** D.I. 110, at Ex. H.

burden on the motion. The burden now shifts to Higgins to rebut the evidence sufficiently to show the existence of material factual issues that must be resolved by the jury.[82] Higgins has failed to sustain this burden. He has offered no record evidence to rebut Joseph's testimony that he had no actual knowledge of unauthorized hunting activity on his property. Instead, Higgins attempts to create a genuine issue as to Joseph's constructive knowledge by pointing to evidence that Joseph was regularly on the property to observe as a portion of the land was being cleared for future development.[83] Yet Higgins has presented no evidence to suggest that Joseph would have encountered any unauthorized hunters on the property during these occasions, much less evidence that Joseph would have witnessed unsafe hunting practices when he visited his 156 acre property. Nor has he presented any evidence to rebut Joseph's sworn testimony that he was not on the property on the day of the incident.[84]

At oral argument, Higgins' counsel alleged that Joseph had constructive knowledge of a dangerous condition because he was aware that people used his property for hunting. The Court has searched the record and has found no evidence to support this contention.[85] Rather, the facts in the record indicate that Joseph allowed only one person, a local state trooper, to hunt on his property.[86] And there is simply no evidence to suggest that this person ever constituted a "dangerous condition" such that the Court could find that Joseph had constructive knowledge of a hazard on his property.

■■ In the absence of more, the Court is satisfied that no reasonable jury could find that Joseph knew or should have known that a dangerous condition (unauthorized/unsafe hunters) existed on his property. Absent such knowledge, there

---

82. *Brzoska,* 668 A.2d at 1364.

83. D.I. 56, at 2. Although the Court has found that Higgins is collaterally estopped from litigating the issue of permission, the Court acknowledges that Higgins has argued that permission was granted and that such permission forms a basis to infer Joseph's knowledge of unsafe hunting on the property. Even if the issue of permission was not subject to collateral estoppel, the Court would still find that Higgins has not sustained his burden of demonstrating a material dispute of fact regarding this issue. The only evidence that would support a finding that the hunting party had permission to hunt on Joseph's property is a double hearsay statement of David Tyre in the written police report of the incident to the effect that he and the other hunters had permission to hunt on the Joseph property. *See* D.I. 110, at Ex. C. This statement would not be admissible at trial and cannot, therefore, defeat a properly supported motion for summary judgment. *See Monsanto Co. v. Aetna Casualty & Surety Co.,* 1993 WL 563246, at *1 (Del.Super.)(emphasizing that "a party cannot oppose a motion for summary judgment on the basis of unau-

thenticated and inadmissible documents.") (citations omitted). Moreover, even if the statement was competent evidence, it could not, alone, overcome the mountain of evidence demonstrating that the hunting party did not have permission. First, in a sworn affidavit given in this case, Tyre himself denied ever making the statement attributed to him by the police and affirmed that no member of the hunting party was given permission to hunt on the Joseph property. *Id.* at Ex. D. Additionally, Joseph testified that he had not given permission to any member of the hunting party to hunt on his property. Finally, in his deposition, Walls testified that the hunting party did not have permission to hunt on Joseph's property. *Id.* at Ex. H; D.I. 91, App. at 155. There is, therefore, no genuine dispute of material fact on this issue.

84. D.I. 41, at 8.

85. *See Burkhart v. Davies,* 602 A.2d 56, 60 (Del.1991)(finding that unsupported allegations will not survive summary judgment).

86. D.I. 110, Ex. B.

is no basis to conclude that Joseph owed a legal duty to Higgins. Joseph's motion must, therefore, be **GRANTED**.

### b. Mitchell Owed No Duty To Higgins

■ Viewing the evidence in a light most favorable to Higgins, the following circumstances bear on the question of whether Mitchell owed a duty to Higgins: (i) the hunting party did have permission to hunt on the Mitchell property; (ii) neither Mitchell nor her legal guardian were present on the property at the time of the incident; (iii) the shot that struck Higgins was not fired from Mitchell's property; and (iv) Higgins was not on Mitchell's property when he was struck by the bullet.

Higgins claims that Mitchell had a duty as a landowner to protect the public from injury that he reasonably could expect to result from activities occurring on her property.[87] Here, Higgins claims that because Mitchell (through her representative) granted permission to the hunting party to hunt on her property, she had a duty to protect the public from the dangers of their foreseeable actions, including criminal and negligent actions. Higgins further contends that because Marvel, the caretaker, had previously hunted with Walls and had ostensibly observed him use an illegal weapon in this pursuit, Mitchell, through Marvel, had a duty to control the conduct of Walls to ensure that he would not injure the public by his imprudent hunting practices.

■ Two important conditions must exist in order to give rise to a private landowner's duty to control the conduct of third parties whom she permits to be on her property: presence and control. The landowner's presence on the property allows the owner to know what is occurring on the property so that the owner may exercise control over the property and the activities occurring on it.[88] And, given that a landowner's control over the property is a key component in the determination of whether she owes a duty, the landowner generally will not be held responsible for acts that occur outside the boundaries of her property.[89] Courts have concluded

---

**87.** *Hercules Powder Co. v. DiSabatino*, 188 A.2d 529, 534 (Del.1963) *citing* RESTATEMENT (SECOND) OF TORTS § 302 (1965)("The extent of the duty of the landowner to members of the public, and the standard of care he must conform to is measured in terms of the foreseeability of injury from the situation created by him.").

**88.** *See* RESTATEMENT (SECOND) OF TORTS § 318 (1965)("If the actor permits a third person to use land or chattels in his possession otherwise than as a servant he is, *if present*, under a duty to exercise reasonable care so as to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily injury to them if the actor: (a) knows or has reason to know that he has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control.")(emphasis add-

ed). *See also Knight v. Rower*, 170 Vt. 96, 742 A.2d 1237, 1242–43 (1999)("Under § 318, property ownership alone is not sufficient to produce liability ... '[p]resence' is central to the principle of liability articulated in § 318. The owner's presence when the activity occurs is a prerequisite for the owner's *ability* and *opportunity* to exercise control over the person engaging in the activity."); *State v. Brown*, 129 Ariz. 347, 631 P.2d 129, 132 (Ct.App.1981)("The rule [of § 318] is applicable where the possessor of land is present and the land is being used or the activity is being carried on with his permission, and when, therefore, he has not only the ability to control the conduct of the third party as possessor, but also the opportunity to do so.").

**89.** 62 AM. JUR. 2D *Premises Liability* § 12 (2005)("Courts do not generally impose a duty of care upon an occupier of land beyond that which he or she possesses or controls. Mere adjacency does not connote control nor

that although a landowner may initially have a duty to control the conduct of a third person while that person is on her property, the duty ends when the person leaves the property.[90]

Neither Mitchell nor Marvel were present on the Mitchell property at the time of the incident. As such, neither of them had any actual ability to control the conduct of Walls and no duty, therefore, to protect Wiggins from Walls' negligent conduct. Moreover, because Walls was not on the Mitchell property at the time he fired the shot that struck Wiggins, Mitchell had no duty to control his behavior.

Higgins' characterization of hunting as a highly dangerous activity does not alter the duty analysis.[91] Unless there were facts in the record to support the notion that Walls was subject to the control of Mitchell (or her representative) at the time he fired the shot that injured Higgins, there is simply no basis in the law to impose a duty upon her, even if the activity at issue (hunting) is deemed to be inherently dangerous.[92]

Finally, the Court cannot leave this issue without addressing an analogy offered by plaintiffs' counsel during oral argument to illustrate why Mitchell owed a duty to Higgins:

> A owns a property atop a hill. B owns property down the hill from A and further down the hill there is a public roadway. A negligently allows a boulder to remain on his property in a position that it is likely to become dislodged and roll down the hill. This, in fact, occurs and the boulder leaves A's property, crosses B's property and causes injury to a motorist on the public roadway below. According to Higgins, A may properly be found to have owed a duty to the motorist (and to have breached that duty), even though the boulder had been on B's property immediately before striking the motorist, because A reasonably could foresee that the boulder would leave his property and cause injury to motorists passing on the roadway adjacent to B's property.

The analogy is accurate as far as it goes. A may well owe a duty to passing motorists on the roadway below his and B's property to protect them from harm caused by dangerous conditions that exist on A's property. But the facts of this case

---

impose liability.... Responsibility for adjacent land must be predicated on an exercise of control over land beyond the boundaries of one's own land.").

**90.** *See Davis v. Kwik–Shop, Inc.*, 504 N.W.2d 877, 879 (Iowa 1993)("We are aware that Restatement (Second) of Torts § 318, recognizes certain duties of reasonable care for a possessor of land to control the conduct of licensees upon its premises. However, we have recognized limits on those duties.... [O]nce the assailants left [the] property, [the landowner] no longer had a special relationship with them; therefore, [he had] has no duty to protect [the injured party].").

**91.** *Cf.* RESTATEMENT (SECOND) OF TORTS § 318 cmt. c (1965). This comment provides for a heightened duty where the landowner allows a highly dangerous activity

to take place on the property. Even if hunting could be construed as a highly dangerous activity, the Restatement only provides for a duty upon the landowner when the landowner is present. Accordingly, because neither Mitchell nor Marvel were present on the land, they fall outside the purview of this section.

**92.** 65A C.J.S. *Negligence* § 575 (2002)("As [a] general rule, a landowner has no duty to prevent criminal acts of third parties who are not under the landowner's supervision or control."); 62 AM. JUR. 2D *Premises Liability* § 40 (2005)("One person generally has no duty to control the conduct of another. When an injury occurring on premises is the result of negligence of a third person who does not stand in a relation to the owner or occupant as to render the doctrine of respondeat superior applicable, no liability attaches to the owner or occupant....").

bear little resemblance to the boulder analogy. Here, there is no evidence to suggest that the instrument of harm (Walls' rifle discharge) was a dangerous condition that was negligently allowed to exist on Mitchell's property. The dangerous condition—Walls firing the bullet in the direction of a public roadway—first surfaced on the Joseph property. Under these circumstances, Mitchell owed no duty to Higgins as a matter of law. Mitchell's motion for summary judgment must be **GRANTED.**

## 2. Messick Owed A Duty To Higgins Properly To Issue Hunting Licenses

 Messick argues that the so-called Public Duty Doctrine shields it from liability in this case because any duty that it owed with respect to the issuance of hunting licenses ran to the public at large as opposed to any individual citizen.[93] While Messick's characterization of the Public Duty Doctrine is generally accurate, it has missed the mark in its application of the doctrine to the undisputed facts of record. The Public Duty Doctrine applies only to governmental employees.[94] The Court already has determined, however, that Messick operated as an independent contractor of the State of Delaware in performing its licensing function, not as an agent or employee of the government. This fact alone renders the Public Duty Doctrine inapplicable here.[95]

*Johnson v. Indian River School District,* cited by Messick, does not dictate a different result.[96] Indeed, in *Johnson,* the court held that the test for the applicability of the Public Duty Doctrine is whether the actor stood in the shoes of the State.[97] There is no suggestion in *Johnson* or in any other authority cited by Messick that the doctrine would extend to a privately owned commercial entity that is contracted by the State to provide a service to the public for a fee.[98]

 Moreover, in order for Public Duty Doctrine to apply, there must be an exercise of discretion on the part of the actor in its official capacity such that the policy that animates the Public Duty Doctrine is fulfilled.[99] This doctrine, like the Tort Claims Act and sovereign immunity, is intended to protect government officials from liability when they make good faith decisions in their official capacities for the benefit of the public.[100] Such protection from liability only occurs where the act by the government official is discretionary rather than ministerial in nature.[101]

Discretionary acts are those which require some determination or implemen-

---

93. *See* D.I. 90, at 23.

94. *Johnson v. Indian River School District,* 723 A.2d 1200, 1203 (Del.Super.Ct.1998).

95. *Martin v. State,* 2001 WL 112100, at *9–10 (Del.Super.).

96. 723 A.2d 1200 (Del.Super.Ct.1998).

97. *See id.* at 1204.

98. Messick cites to several cases to support its argument, but none involve so-called "agents" of the State. *See, e.g., Harris v. Del. Hosp. For the Chronically Ill,* 2001 WL 1739190 (Del.Super.)(the actor was a state hospital); *Martin v. State,* 2001 WL 112100 (Del.Super.)(the actor was a state juvenile facility); *Hall v. McGuigan,* 743 A.2d 1197 (Del.Super.Ct.1999)(the actor was a state prison). *See also Johnson,* 723 A.2d at 1203 ("When a governmental employee is sued for acts arising out of the performance of his or her job, the Public Duty Doctrine comes into play.").

99. *See Johnson,* 723 A.2d at 1203.

100. *See id.*

101. *Sussex County v. Morris,* 610 A.2d 1354, 1358–59 (Del.1992)(finding that ministerial acts, as contrasted to discretionary acts for which the government entity is absolutely immune under the Tort Claims Act, describes an

tation which allows a choice of methods, or, differently stated, those where there is no hard and fast rule as to a course of conduct. Ministerial acts, by contrast, are those which a person performs in a prescribed manner without regard to his own judgment concerning the act to be done.[102]

Messick's task here was much more ministerial. It had a set procedure that it was obliged to follow; it enjoyed no discretion in its licensure decisions.[103] For purposes of this motion, Messick concedes that it did not verify that Walls had completed the required safety course and did not adequately explore Walls' criminal record. Messick simply failed to follow the prescribed procedure for issuing hunting licenses. This failure to act does not reflect the requisite exercise of discretion to implicate the Public Duty Doctrine.

Messick has offered no other basis upon which the Court could conclude that it owed no duty to Higgins and the Court can discern none on its own. Consequently, Messick's Motion for Summary Judgment must be **DENIED**.

## VI.

The Public Recreation Act does not protect Joseph because he did not give the hunting party permission to hunt on his property and Higgins was not on Joseph's property when he was injured. Neverthe-

less, the Court has determined as a matter of law that Joseph did not owe a duty to Higgins because he did not know or have reason to know that a dangerous condition existed on his property. Therefore, Joseph's motion for summary judgment is **GRANTED**.

While neither the Public Recreation Act nor the Guest Premises Statute provide protection for Mitchell, liability will not rest with Mitchell because she owed no duty to Higgins. Neither Mitchell nor her representative were present on her property when the shot was fired and cannot, therefore, as a matter of law, be held liable for Walls' conduct. Moreover, the undisputed facts reveal that the shot was not fired from Mitchell's property. Accordingly, Mitchell's motion for summary judgment is **GRANTED**.

Messick cannot avail itself of sovereign immunity, the protections of the Tort Claims Act, other statutory grants of immunity, or the common law Public Duty Doctrine because it acted as an independent contractor, not as an agent of the State, when it issued State of Delaware hunting licenses. Consequently, its motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

act which may involve an insignificant element of choice that the General Assembly has not insulated from liability).

**102.** *Simms v. Christina School Dist.,* 2004 WL 344015, at * 8 (Del.Super.).

**103.** Messick lists several factors in an attempt to show that it exercised discretion when issuing hunting licenses. These include: the manner in which the license process was administered on site; rejection of applicants; referral of prospective licensees to the State when issues arose; setting store hours; hiring and firing staff; maintenance of accounting

and administrative records; monitoring of sales; communication with DNREC to confirm the applicant's completion of the hunter safety course when a hunter safety card had not yet been issued; and evaluation of the proofs supplied by the licensee in support of the license application. D.I. 90, at 20. While all of these facts demonstrate that the State did not control the *manner* in which Messick performed its licensing function, none of these factors amount to the exercise of official discretion in determining eligibility for licensure within the contemplation of the Public Duty Doctrine or other immunity-based doctrines.