**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| NEW CASTLE SHOPPING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0571-SEM |
| | ) | |
| TRUSTEES OF NEW CASTLE COMMON, | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dated: October 7, 2024

1. This final report makes post-trial findings of fact and reaches conclusions of law regarding plaintiff New Castle Shopping LLC's ("New Castle") claims of trespass and nuisance.

2. New Castle initiated this action on July 2, 2021.[1] In its complaint, New Castle named five defendants: Trustees of New Castle Common ("Trustees"), Dunkin' Donuts LLC ("Dunkin'"), AARK Network Inc. ("AARK"), CD&D Realty Holding Co., LLC ("CD&D"), and G Custom Work LLC ("G Custom").

3. On June 3, 2022, G Custom moved for judgment on the pleadings.[2] After oral argument on November 3, 2022, I denied the motion, finding an issue of

---

[1] Docket Item ("D.I.") 1.

[2] D.I. 31.

material fact precluded judgment in G Custom's favor at that time.[3] No exceptions were filed, but all parties filed motions for summary judgment shortly thereafter.[4] I heard argument on those motions on May 30, 2023.[5] I ruled on the motions telephonically on June 16, 2023, denying the motions involving Trustees, but granting those filed by the remaining defendants: Dunkin', AARK, CD&D, and G Custom.[6] I stayed exceptions pending my final post-trial decision.[7]

4.      The remaining claims against Trustees (with New Castle, the "Parties") were tried on July 12–13, 2023.[8] The Parties completed post-trial briefing on November 17, 2023, and I took this matter under advisement after post-trial argument on May 21, 2024.[9] This is my final post-trial ruling.

---

[3] *See* D.I. 58–59, 61.

[4] D.I. 62, 64–67.

[5] *See* D.I. 92.

[6] *See* D.I. 98–101, 105.

[7] D.I. 105.

[8] *See* D.I. 125–27. Before trial, I ruled on various pre-trial motions. *See* D.I. 108, 121–25.

[9] *See* D.I. 138, 140–42.

5.      The Parties' stipulations, the evidence presented at trial, and that of which I take judicial notice, support the following findings of fact.

6.      New Castle operates the Penn Mart Shopping Center and leases the land thereunder from Trustees (the "Property") under a long-term lease.[11] In connection with the lease, the Parties entered into an independent repair and maintenance agreement on April 16, 1986 (the "Maintenance Agreement").[12] Through the

---

[10] The facts in this report reflect my findings based on the record developed at trial on July 12–13, 2023. *See* D.I. 126–27. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts (*id.*) are in the form "Tr. #." I cite to the joint exhibits as "JX __." *See* D.I. 128.

   A few evidentiary objections were preserved and are hereby addressed. First, Trustees waived all objections which were preserved but not briefed post-trial; thus, the objections to JX3, 21, 22, 38, 39, and 45 are overruled, and those exhibits are admitted. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Second, the objection to JX94 is overruled. JX94 is a video showing flooding on the Property, as defined herein, in June 2023. Although the video was not produced during discovery (because it did not exist), I find no unfair surprise or prejudicial effect from its admission and give it the weight and credibility I find it deserves. Third, and finally, the objections to JX142–45 are overruled. JX142–45 are photographs from an expert report, not otherwise in evidence. New Castle objected, arguing Trustees did not lay a proper foundation. I agree with New Castle that the photographs are not admissible to establish a static condition of the drains. I do, however, find them illustrative of what the drains looked like when the photographs were taken and admit them for that purpose, giving them such appropriate weight.

[11] D.I. 107 at 3.

[12] JX114.

Maintenance Agreement, New Castle agreed to "keep all areas of [the Property] in a clean and sanitary condition, all buildings and grounds and facilities."[13]

7.     Trustees also owns a vacant parcel of land upgradient from, and immediately contiguous to, the Property (the "Trustees' Property"). Prior to October 2020, Trustees' Property included a stormwater drainage swale that was once densely vegetated (the "Swale").[14]

8.     In October of 2020, Rory Lane with NuCar Connection, Inc. excavated and de-vegetated the Swale, without permission from, or to the knowledge of, Trustees.[15] Excavation of the Swale increased waterflow onto the Property and, since the Swale's excavation, New Castle has experienced multiple instances of stormwater flooding.[16] Water that flowed through the Swale, as excavated, carried dirt, mud, and debris onto the Property.[17]

---

[13] *Id.* at 2.

[14] *See* JX61 (reflecting the vegetated area as it existed in 2018).

[15] Tr. 425:13–18, 431:1–3 (Marinelli); *see also* JX69 (showing excavation occurring on October 8, 2020); JX110 (same); JX70 (showing additional excavation had occurred by October 9, 2020); JX62 (reflecting a ditch where the Swale once was, as of October 15, 2020).

[16] *See, e.g.*, JX111 (reflecting substantial flooding on October 29, 2020); *see also* Tr. at 176:1–16 (Powell) (explaining the deluge onto the Property after the excavation). The Parties disagree regarding the history of flooding on the Property and in the Area (as defined herein in ¶10). *Compare* Tr. 26:12–13 (Pilevsky) *with* Tr. 417:24–418:8 (Marinelli).

[17] *See* JX72 (showing mud and debris on the Property as of November 6, 2020); JX73 (same); Tr. at 31:18–32:5 (Pilevsky).

9.      Trustees became aware of the excavation no later than January 28, 2021.[18] Trustees immediately began to investigate and, within weeks, informed New Castle that it would work to remediate the excavation.[19] In May 2021, Trustees retained Cirillo Brothers, Inc. ("Cirillo") and paid them $33,800.00 to fix the Swale.[20] Cirillo performed work on Trustees' Property in July 2021, the same month this action was commenced.[21] In short, Cirillo enlarged the riprap area and widened the Swale.[22] These remediation efforts involved the use of straw or hay, which

---

[18] Tr. 431:10–16 (Marinelli).

[19] *See* Tr. at 431:19–21 (Marinelli); 183:11–16 (Powell).

[20] JX5.

[21] *See* JX4; Tr. at 224:4–7 (Powell) (explaining he took the photograph in JX112 of Cirillo, as defined herein, performing the remediation in July 2021).

[22] *See* at Tr. 377:9–16 (Michael Cirillo, hereinafter "M. Cirillo"); *see also* JX85–86 (reflecting early remediation efforts); JX83 (reflecting the refilled ditch on or around July 14, 2021); JX88–89 (similar); JX36 (reflecting additional grass growth within the refilled areas, but also showing straw and other debris on the Property, as of August 12, 2021); JX90–91 (similar, showing mud and debris covering drains on the Property); JX23–25 (similar, as of August 19, 2021); JX119 (similar).

Michael Cirillo, the founder, CEO, and president of Cirillo admitted that straw was washed away and brought sediment with it from the Swale onto the Property. Tr. 375:9–13, 385:11–20, 401:7–8. That is why his team worked to seed and encourage grass growth—for stability. Tr. 385:11–20, 409:19–410:3.

Trustees' expert, Dr. Paraskewich, whose testimony is addressed later in these findings of fact, explained that "[t]here's always a period during construction where you can have sediment transport. . . . But the practice would be to have some matting and stabilization on the edges[.]" Tr. 285:17–286:1. Looking at Cirillo's work, he noted "it appears to be matted[.]" *Id.*

5

flowed onto the Property, further clogging drains within the paved area explained below.[23]

10.    The portion of the Property that meets, at least in pertinent part, Trustees' Property is a paved area (the "Area"), on which there are drains for stormwater management. The Parties agree that the flooding and debris following the excavation have further eroded the cracked pavement in the Area.[24]

11.    New Castle has not undertaken any efforts to clear out the piping underneath the storm drains in the Area.[25] And, although the pavement in the Area has been cracked for many years, New Castle has never hired a paving company to fully repave the area, although it has patched potholes.[26] The company that provides property maintenance for the Property was expected, however, to walk the perimeter

---

[23] *See, e.g.*, JX36, 89.

[24] *Compare* Tr. 178:2–7, 216:14–217:6 (Powell) (explaining that he watched who he thought was Cirillo, as defined herein, push mud back onto Trustees' Property after a flooding event, taking "chunks of the parking lot" with it) *with* Tr. 393:20–394:7 (M. Cirillo) (denying that Cirillo was the one who scraped the mud off right after the excavation of the Swale); *see also* JX17 (reflecting sediment from the excavation as of March 2, 2021); JX79 (same as of March 24, 2021); JX16 (same as of June 6, 2021).

[25] Tr. 70:20–24 (Pilevsky) ("No reason to clean storm drains that are working.").

[26] Tr. 78:23–79:2, 91:8–13 (Pilevsky); *see also* JX18 (reflecting damage to the paved area as of September 19, 2020); JX26 (similar, as of May 9, 2009), JX140 (similar, as of October 7, 2011).

of the Property and, within the Area, "mak[e] sure that the drains are cleaned off in case it rains[,]"[27] once a week.[28]

12. Since Cirillo's work, the Property has continued to flood. As reflected in a video admitted at trial, in August 2021, there was substantial flooding at the Property, which a witness estimated at "a good foot" of water in the Area.[29] Flooding was witnessed, and documented by video evidence, again in September 2021.[30] The Property also flooded in June 2022.[31]

13. The Property was still flooding as recently as June 2023, leaving debris and asphalt in the drains.[32] This flooding happened on or around June 26–27, when the local area received over four inches of rain during a two-day period.[33] After that flooding event, one witness saw "[a]sphalt chunks on top of the drains" and "[m]ore of the asphalt missing from the path of the water."[34]

---

[27] Tr. 166:4–5 (Powell).

[28] Tr. 165:18–19 (Powell). Trustees questions whether this work was routinely (or ever) done. *See* Tr. at 418:20–21, 419:10–14 (Marinelli). The Parties also dispute whether New Castle County cleans out the drains. *Compare* Tr. 204:20–205:12 (Powell) *with* Tr. 439:8–11 (Marinelli).

[29] Tr. 191:10; JX11.

[30] JX13–15.

[31] *See* JX52, 56. After this flooding, the pavement in the Area further deteriorated. *See, e.g.*, JX41–42 (showing cracked and crumbling pavement on the Property as of September 28, 2022).

[32] Tr. 197:16–198:6 (Powell); JX94.

[33] *See* JX141.

[34] Tr. 203:14–16 (Powell).

14. A photograph, however, shows the Swale with much more vegetation as of June 28, 2023.[35] New Castle's representatives also admit that the Swale had more vegetation and "greenery" by the time of trial.[36] But, per Allen Pilevsky, the president of New Castle's property manager, "every time it rains, there's more mud on the [P]roperty."[37] Conversely, per Mr. Cirillo, as of the night before trial "there's zero sediment. After all the[] rains . . . in the last two or three weeks, tornadoes, hurricanes, whatever. [There was] no sediment leaving that swale at all, zero."[38]

15. The Parties each proffered an expert witness.

    a. Brian Conlon testified as New Castle's expert.[39] He is a partner at Langan Engineering & Environmental Services and a licensed engineer in the

---

[35] JX129; Tr. 436:14–24 (Marinelli).

[36] Tr. 120:10, 120:19 (Pilevsky); *see also* JX129 (admitted in part; depicting the condition of the Swale around the time of trial); Tr. at 132:7–11, 133:2–3 (Pilevsky).

[37] Tr. 121:6–7. Mr. Pilevsky testified that since the excavation he has noticed "missing asphalt[,]" mud on the Property, "[a] couple of the dry wells have sunken in[,]" and others are "filled with mud." Tr. 56:8–11. He has received a proposal to "take away the broken asphalt and put a new subbase and a top, all asphalt, and adjust the drain covers." Tr. 58:8–10. Mr. Pilevsky attempted to testify regarding the amount of that quote, to which Trustees objected. *See* Tr. at 66:3–10. The objection is sustained, and I have not considered that testimony in rendering this decision.

[38] Tr. 388:19–23.

[39] Trustees objected to, and asked me to strike, Mr. Conlon's testimony, arguing he did not testify to a reasonable degree of certainty. The objection is overruled. Delaware law does not require experts to utter magic words for their testimony to be admissible. *Chapman v. AstraZeneca Pharm. LP*, 2022 WL 4740721, at *4 (Del. Super. Oct. 3, 2022). Rather, an expert's opinion is admissible if it "allow[s] the Court to conclude that the expert finds: (i) one option more probable or likely than the others; (ii) that, having weighed varying factors or consulting material from his field, the expert has eliminated other possible causes; or

8

States of Delaware, New Jersey, New York, and Maryland, and the Commonwealths of Pennsylvania and Virginia.[40] He is an expert in the field and study of stormwater management design.[41] Upon visiting Trustees' Property in September 2021, he observed a widened swale, with some revegetation, but also some bare areas.[42] He opined that there are other ways to decrease the flow of water and sediment onto the Property including a detention system: "something that would basically collect the water and slow it back to the original condition[.]"[43] Or, per Mr. Conlon, Trustees could bring the Swale back to its previous state, with more vegetation.[44]

      b. Michael Paraskewich testified as Trustees' expert. He is a principal of PELSA Engineering & Land Surveying and holds a doctorate degree in

---

(iii) that the varying factors have led the expert to suspect that this one factor is more likely the cause of the issue than another." *Id.* I find Mr. Conlon's testimony admissible under this test. As addressed above, I have also considered Mr. Conlon's expert report, which was admitted as JX3. Therein, Mr. Conlon provided the opinion that "the alteration of the [S]wale combined with the Dunkin['] Donuts Development increased the stormwater rate and volume of stormwater runoff that leaves the [Trustees' Property] and enters into the [Area]." JX3 at 6.

[40] Tr. 309:10–15, 310:7, 308:9–11.

[41] Tr. 311:24–312:8.

[42] Tr. 325:7–8, 331:1–3; *see also* JX24. Mr. Conlon did, however, admit that "grass and foliage don't grow as fast in July and August as they would in April and May[.]" Tr. 359:17–20.

[43] Tr. 349:1–7.

[44] Tr. 349:7–12.

9

environmental engineering.[45] He is an expert in stormwater management.[46] He explained that the widening of the swale, particularly with vegetation, "would stabilize the channel."[47] In his expert opinion, the drains in the Area were "not functioning as designed" and sediment flow would not have created the issues he viewed within the photographs of the piping.[48] He further explained his view that "if the storm drains are full, . . . you would absolutely get flooding."[49] Reviewing the Cirillo contract, he remarked that the work reflected thereon "would certainly help to remediate sediment transport if the environment was not stable before the work was done."[50] But he testified that he could not determine if the remediation was effective until the drains were repaired.[51]

---

[45] Tr. 264:5–6, 264:2–3.

[46] *See* Tr. at 265:2–8.

[47] Tr. 268:19–21. He explained that widened channels approximate "sheet flow" which "allows more sediment to be removed over time" than a narrow, or V-cut, channel. Tr. 268:22–269:4. A widened channel slows "both the flow of sediment and the velocity at which it's introduced to the neighboring environments." Tr. 269:15–17. More vegetation within the channel "hold[s] the sediment stable[,]" and keeps it from flowing into other areas. Tr. 269:21–24.

Dr. Paraskewich clarified, however, that he was "not asked to model sediment transport or, you know, surface flow," but rather "to evaluate whether a well-vegetated channel would remove sediment and is designed to remove sediment." Tr. 280:17–21. In his opinion, "it's nearly impossible to accurately model what [experts] traditional call a pre/post analysis" of flow rate. Tr. 282:13–17.

[48] Tr. 271:2, 277:15–22.

[49] Tr. 292:12–14.

[50] Tr. 289:1–3.

[51] Tr. 293:13–16.

## CONCLUSIONS OF LAW

16. New Castle pled and continues to pursue claims against Trustees for trespass and nuisance, and seeks injunctive relief related thereto.[52]

17. New Castle bears the burden of proving its claims by a preponderance of the evidence.[53] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[54]

18. "Conceptually, cases involving wrongful discharge of water onto a neighboring property can be looked at as a trespass—a wrongful invasion of real property—or a private nuisance—a wrongful deprivation of the quiet enjoyment of real property."[55] It makes little difference which theory is operative here. Like Vice Chancellor Glasscock in *Robinson v. Oakwood Village, LLC*, I find it most

---

[52] In their pretrial stipulation, the Parties each listed attorneys' fees as an additional legal issue to be addressed at trial. D.I. 107 at 8, 9. But neither side briefed a basis on which fees should be shifted in their post-trial briefing. *Cf.* D.I. 134 at 27 (merely listing "an award of costs and attorney's fees, as well as any additional relief this Honorable Court deems just and proper" in the wherefore clause). On this record, I find the fee shifting requests waived and decline to address them any further. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[53] *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002).

[54] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citation and quotation marks omitted).

[55] *Robinson v. Oakwood Vill., LLC*, 2017 WL 1548549, at *12 (Del. Ch. Apr. 28, 2017).

11

appropriate to treat the theories together under the lens of the "reasonable user" rule.[56]

19.     "Delaware law recognizes the general right for an upper landowner to drain water by means of its natural flow[.]"[57] When the upgradient landowner artificially increases the flow of water, its conduct is judged based on the "reasonable user" rule. "This approach requires the Court to inquire into the facts of each case to determine the reasonableness of the effects of the action on the interests of all parties affected."[58] This reasonableness test requires that I balance several factors, including: "the amount of harm caused, the foreseeability of the harm which results, the utility of the owner's use of his land as weighed against the gravity of the harm which results from altering the flow of surface waters . . . and . . . whether the upper owner's conduct is intentional and unreasonable, or reckless or negligent."[59]

20.     Before I apply these factors, I must decide whether Trustees, as the upgradient landowner, artificially increased the flow of water to the Property. I find that it did. Although the excavation was done by a third party, Trustees, as the

---

[56] *Id.*

[57] *Id.*

[58] *Trs. of Vill. of Arden v. Unity Constr. Co.*, 2009 WL 1530711, at *2 (Del. Ch. May 27, 2009) (citation and quotation marks omitted).

[59] *Weldin Farms, Inc. v. Glassman*, 414 A.2d 500, 502 (Del. 1980).

landowner, is still responsible for the affects from the excavation of the Swale.[60] There is no reasonable dispute that the excavation artificially increased the flow of water onto the Property.

21.     Thus, I must turn to the above factors to determine if Trustees acted reasonably to address that increase. I judge Trustees' conduct at two points in time: (a) immediately following excavation of the Swale; and (b) during its efforts to remediate the excavation of the Swale. I find Trustees acted reasonably during both.

a.    Trustees acted reasonably immediately following the excavation of the Swale. Trustees was not involved in the excavation; it did not ask for, or approve of, the alterations to the Swale. Once it was informed of the excavation, Trustees acted promptly to begin remediation.[61] Weighing the above factors, I find Trustees should not be held liable for any trespass or nuisance flowing from the initial excavation. To hold that Trustees should have acted sooner under the circumstances would impose far too high a bar.

---

[60] *See Higgins v. Walls*, 901 A.2d 122, 139 (Del. Super. 2005) ("A property owner can, under certain circumstances, face liability for the acts of those on his property without permission and for injuries sustained off the property. And while it is generally true that a landowner does not owe a duty to those injured by others on the property over whom the landowner has no control, a duty may arise where the landowner knew or should have known of the risk created on his property and did nothing to prevent it.").

[61] *See also* D.I. 142 at 15:2–4 (conceding "the delay [in beginning remediation] is not in any way a material portion of our claim against the defendant").

b. Trustees also acted reasonably in connection with the remediation efforts. Trustees hired an experienced company to repair and improve the Swale, the company prepared an appropriate scope of work to do so, and the company followed through with that work. Inevitably, during the construction process, there was some mud, sediment, and straw run off from Trustees' Property to the Property. But New Castle has failed to demonstrate that, more likely than not, that run off was the product of intentional or unreasonable conduct. Further, because regrowth takes time, it remains unclear if the Swale has been revegetated sufficiently to bring it back to pre-excavation conditions. But New Castle bore the burden of proving wrongful discharge of water from an unreasonable upgradient landowner; it failed to do so.[62] Balancing the harm evident in the photographs and videos (*e.g.*, mud and straw on drain covers, flooding and ponding, and crumbling pavement) against the (1) pavement's age, lack of prior repair, and historical patching; and (2)

---

[62] New Castle decried, in opening remarks at trial, what they interpreted as an attempt from Trustees to shift the burden. Tr. 7:20–8:10. New Castle summarizes Trustees' position as, in essence, arguing that once Trustees "performed certain remediation in 2021, then [their] remediation was sufficient to satisfy whatever obligation [they] had to stymie the flow of the water. And that after that, any issues with the water completely are on [New Castle], whether it be maintaining catch basins, maintaining drain basins, et cetera." *Id.* I agree with New Castle that this is not the appropriate lens. But New Castle, nonetheless, bears the burden of demonstrating that, despite the remediation, the waterflow from Trustees' Property onto the Property is at an unreasonable level such that the remediation was not the conduct of a reasonable user. New Castle failed to meet this burden.

14

reasonable and professional remediation efforts by Trustees, I find in favor of Trustees.[63]

22.     Trustees conducted itself like a reasonable user and should not be held liable for trespass or nuisance. New Castle's proffered case law largely supports this holding.[64]

23.     Nevertheless, even if I found some amount of trespass or nuisance from the runoff during or after remediation of the Swale, New Castle failed to prove that injunctive relief is warranted. New Castle sought injunctive relief ordering Trustees to engage in additional remediation to slow the flow of water onto the Property. To prevail, New Castle needed to prove: (1) "actual success on the merits of the claims; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result if an injunction is not entered outweighs the harm that would befall [Trustees] if an injunction is granted."[65] Unlike in *Wilmont Homes Inc. v. Weiler*, the evidentiary record does not reflect that the trespass or nuisance is "real and continuing" and could only be abated by further remediation.[66] The trial record

---

[63] *Cf. Robinson*, 2017 WL 1548549, at *12 (finding harm directly traceable to development).

[64] *See, e.g.*, *Higgins*, 901 A.2d 122; *Hayes v. Eaves*, 2013 WL 2297034 (Del. Super. Apr. 30, 2013).

[65] *Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499, at *2 (Del. Ch. June 6, 2003).

[66] 202 A.2d 576 (Del. 1964).

shows drain covers blocked, potential piping issues thereunder, and reason to believe New Castle has not maintained the Area sufficiently to permit adequate drainage or ward against further deterioration of the pavement. Similarly, until the remediation is given time to reach full regrowth, it would be premature to adjudge it insufficient. I also do not have the information before me to weigh the relative harms; Trustees already expended over $30,000.00 in remediation efforts, yet New Castle failed to present admissible evidence regarding damages at the time of trial.[67] Thus, even if I found New Castle successful in demonstrating Trustees was unreasonable, injunctive relief should, nonetheless, be denied.[68]

24. For the foregoing reasons, I find judgment should be entered in favor of Trustees.

---

[67] New Castle is correct that Delaware law implies damage for trespass, but that does not relieve it from the obligation to make a sufficient showing of harm to prevail in this balancing exercise; it failed to do so. *Cf. O'Bier v. JBS Constr., LLC*, 2012 WL 1495330, at *2 (Del. Super. Apr. 20, 2012) ("Any unlawful entry upon another's land constitutes a trespass, and the law implies damages for such a trespass, but the amount depends upon the damage actually done.").

[68] New Castle's failure to specify the specific injunctive relief requested further supports this denial. As discussed during post-trial argument, New Castle has been unable, or unwilling, to articulate what remedial measures would be sufficient. Absent a showing of continuing irreparable harm that outweighs the burden of further remediation, I decline to force the Parties and the Court to engage in add-on proceedings to explore, litigate, and dictate the bounds of remediation, an exercise that should have been done in connection with our trial.

25.    This is a final report under Court of Chancery Rules 143 and 144. Exceptions to this report, or any prior rulings to which exceptions were stayed, may be taken within eleven days of the date hereof.[69]

/s/ Selena E. Molina
Magistrate Selena E. Molina

---

[69] *See* Ct. Ch. R. 144(d)(1) ("In actions that are not summary in nature or in which the Court has not ordered expedited proceedings, any party taking exception shall file a notice of exceptions within eleven days of the date of the report.").